EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUIS MARTÍN AYMAT, acusado y apelante.

*Número:* CR-76-44    *Resuelto:* 5 de enero de 1977

*Yamil Galib Frangie* y *José M. Muñoz Silva,* abogados del apelante; *Miriam Naveira de Rodón, Procuradora General, Roberto Armstrong, Jr., Procurador General Interino,* y *Justo Gorbea Varona, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

Un jurado trajo veredicto de asesinato en primer grado contra el apelante, y otro de no culpable en el caso por portación de un revólver cargado (Art. 8, Ley de Armas). La prueba, que descansa en el testimonio directo de un solo testigo, estableció que existía estrecha amistad entre el acusado y la víctima Walter de Jesús, un próspero contable, ambos practicantes de un culto espiritista que propició el dominio de la mente y la voluntad de Walter por el amigo que se erigió en su guía espiritual. Declaró el único testigo presencial que el 10 de julio de 1970, como a las cuatro de la tarde, el acusado lo invitó a acompañarle donde se hallaba De Jesús en la zona del faro de Cabo Rojo. Hubieron de abandonar el automóvil y subir una escarpada montaña hasta dar con De Jesús en un punto apartado, agreste y solitario de la costa. Se quejaba de fuerte dolor de cabeza y tenía las manos sobre el cráneo. Al rato el acusado Aymat extrajo del bolsillo un frasquito con un líquido blancuzco cuyo contenido le dio a tomar, lo que hizo el atormentado, quien quince minutos después aumentó su desesperación, se ponía rígido, se ñangotaba y se asía de los matojos que por allí crecían. El testigo intentó ayudarlo pero el acusado apuntándole con un revólver le prohibió que lo tocara o le hablara, por lo que el primero optó por abandonar el lugar, bajó hasta el automóvil y allí esperó al acusado cuyo automóvil conducía. En el antes descrito paraje

aislado apareció tres días después, el cadáver descompuesto de Walter de Jesús. (¹)

El juez absolvió al acusado en el caso por posesión ilegal de un revólver (Art. 6, Ley de Armas). De la sentencia que le condenó a prisión perpetua por asesinato recurre el acusado y señala .en su alegato cinco errores, los dos primeros planteando falta de base en la prueba para el veredicto dé culpabilidad y errónea apreciación de la evidencia por el jurado; la nulidad del juicio, consecuencia de la indebida y excesiva participación en los procedimientos de algunos miembros del jurado; la limitación de su derecho al descubrimiento de pruebas y la negativa del tribunal a oír prueba sobre conducta impropia de dos jurados observada durante el juicio.

No se cometieron los dos primeros errores porque un jurado imparcial y objetivo pudo haber resuelto el conflicto entre la teoría del Pueblo y la coartada del acusado y su decisión basada en estricta credibilidad hubiese sido respetada en apelación. Pero el jurado no actuó con la objetividad y ecuanimidad que demanda su alto ministerio. La transcripción de la evidencia oral que consta de más de mil páginas recoge no menos de veinticinco intervenciones de miembros del jurado en el largo proceso, sometiendo a casi todos los testigos a acucioso interrogatorio, abriendo y explorando áreas de información con total menosprecio de la relevancia o admisibilidad de la evidencia, valiéndose para interrogar de listas de preguntas preparadas de antemano, interrumpiendo y argumentando con testigos y con el propio tribunal, solicitando y obteniendo la producción de evidencia documental que ni el fiscal ni la defensa habían estimado necesaria y pidiendo y logrando el retorno a la silla de los testigos del

---

(¹) El patólogo forense certificó envenenamiento con estricnina como causa de muerte. Su dictamen calificó el caso como suicidio, y no homicidio. La defensa presentó una nota sin fecha, escrita y firmada por De Jesús, que alega fue el postrer escrito del occiso, dirigida bajo sobre al acusado, y que dice: "Hermano:—Lo prefiero así. Tu lo comprendes, no me juzgues." La viuda de De Jesús identificó la letra de su esposo en dicha breve nota.

principal testigo de cargo y único presencial de los hechos, cuando ya había sido excusado y no se hallaba bajo las reglas del tribunal, y ya oída y admitida prueba originada por otros testimonios.([2]) La entrada y participación del jurado en el campo de contienda entre fiscal y abogado tomó carta de naturaleza en el juicio al punto de que en determinado momento, llegado el turno de contrainterrogatorio por el fiscal de un testigo de defensa, el juez que presidía expresó que debía antes permitirse al jurado interrogar pues posiblemente haría innecesario el contrainterrogatorio por el ministerio público.([3]) En tal grado estuvo este jurado inmerso en la controversia entre partes que en por lo menos dos ocasio-

---

([2]) Las veinticinco irrupciones del jurado en el juicio ocupan 67 páginas de récord y aparecen recogidas por la transcripción en las siguientes páginas:

| | | | | | | |
|---|---|---|---|---|---|---|
| T.E. II | págs. | 145–146 | | T.E. V | págs. | 649–652 |
| | | 184–185 | | | | 652–666 |
| T.E. III | págs. | 224–225 | | | | 682–685 |
| | | 250–251 | | | | 714–717 |
| | | 290–291 | | | | 765–768 |
| | | 326–327 | | | | 812 |
| | | 355–357 | | T.E. VI | págs. | 859–870 |
| | | 391–392 | | | | 893 |
| T.E. IV | págs. | 429–432 | | | | 895–899 |
| | | 432–434 | | | | 918–921 |
| | | 596–601 | | | | 925–926 |
| | | | | | | 945–946 |
| | | | | T.E. VII | págs. | 1030–1035 |
| | | | | | | 1047–1053 |

Los dos jurados más esforzados en esta línea de conducta eran conocidos de la viuda del occiso Walter De Jesús (T.E. VIII págs. 91–92, sesión de 14 de abril de 1972).

([3]) Así lo narra el récord taquigráfico a la pág. 765 del Tomo V:
"JURADO: (Sr. Frontera)
"Yo puedo mediar, yo tengo que hacerle unas preguntas, cuando yo lo vaya a interrogar yo le voy a decir que ...
"HON. JUEZ:
"¿Usted quiere hacerle unas preguntas? Las puede hacer ahora y así el fiscal a lo mejor no tiene que hacerlas."
En otras ocasiones el propio tribunal alentaba estos ejercicios del jurado.

nes en que el fiscal no consideró necesario utilizar su turno de preguntas, saltaron a la valla los juzgadores con las suyas (T.E. V pág. 812 y T.E. VI págs. 925–26).

El desarrollo del proceso criminal presenta una firme separación de las funciones investigativa y juzgadora, que alcanzó un elocuente reconocimiento en *In Re Murchison*, 349 U.S. 133, 139 (1955), donde el Tribunal Supremo de los Estados Unidos, rechazó la figura del juez que primero investiga como "gran jurado de uno" (*one-man grand jury*) y luego se sienta a juzgar su propio investigado, calificándola como espectáculo en que el juzgador presenta prueba que finalmente ha de sopesar para decidir sobre la culpabilidad o inocencia del acusado. En este caso el jurado, especialmente por dos de sus miembros, se involucró tan intensa y extensamente en la contienda judicial con interrogatorios y hasta iniciativas para producción de evidencia, que sepultó la integridad esencial del proceso. Por su dinámica actuación inquisitorial el jurado entró en impropio contacto con la prueba al punto de vulnerar el debido proceso. Se llegó a la situación extrema en que, distinguiendo a *Murchison*, supra, dijo este Tribunal: "En resumen, nunca ha sido ni es la norma constitucional que cualquier contacto previo con la prueba, no importa su alcance y efectos, incapacite a un juzgador para dirimir posteriormente los méritos de una controversia. En

---

"HON. JUEZ:

"¿Alguna otra pregunta de los miembros del jurado?" (T.E. III pág. 251).

"HON. JUEZ:

"¿Hay alguna pregunta?

"JURADO (Sr. Frontera)

"Si vamos a recesar . . .

"HON. JUEZ:

"Si se puede terminar con la testigo

"JURADO: (Sr. Frontera.)

"P—Testigo, la pregunta mía es; cuando usted fue a Boquerón por indicación del señor Walter de Jesús ¿se encontró con el señor Aymat esperándola? [*sic*]" (T.E. IV págs. 596–7).

cada situación en que se alegue ese defecto constitucional hay que considerar la índole del procedimiento, el grado de relación del juez con la prueba y los probables efectos de esa relación sobre su desinterés e imparcialidad y calibrar esos factores a la luz de la entereza moral y la disciplina profesional que necesariamente debe tener cualquier juez que merezca ese nombre." *In re Marín Báez*, 81 D.P.R. 274, 287 (1959). Para corregir estos excesos también reservamos facultad revisora en *Pueblo* v. *Quiles*, 83 D.P.R. 63, 71 (1961).

La función del jurado consiste en escuchar la prueba que presenten el fiscal y la defensa y pasar juicio sobre la misma con una conciencia limpia y siguiendo las instrucciones relativas al Derecho aplicable que recibe del juez. Por ser jueces de los hechos cuyo veredicto tiene igual respetabilidad que el fallo de un tribunal de derecho, los jurados como cualquier otro juez, no deben ensombrecer su objetividad entrando al campo de lucha entre acusador y defensor que es el juicio criminal. En raras ocasiones estará en orden una pregunta de un jurado durante el examen de testigos, [4] pero el juez que preside el juicio guardador de los principios constitucionales de debido proceso e imparcialidad que gobiernan los procedimientos (Constitución, Art. II, Secs. 7 y 11) debe motu proprio evitar el desenfreno de la participación forense por los jurados. [5] Cuando se permita una pregunta del jurado al testigo para aclarar particulares de su testimonio, el juez debe estar atento al desarrollo de ese

---

[4] *Pueblo* v. *Santiago*, 56 D.P.R. 109, 114 (1940).

[5] La propensión de algunos jurados a envolverse en el debate forense es explicable como parte del fenómeno de popularidad de la profesión jurídica que se manifiesta en la densa afluencia de solicitantes para ingreso a las escuelas de Derecho; y la predilección del público por películas y cintas televisadas sobre investigación criminal y casos de corte que naturalmente destacan la nota dramática sobre el rigor procesal que protege la integridad del juicio. Pero ese entusiasmo laico no tiene lugar en las salas de justicia.

interrogatorio y cortar su vuelo a tiempo si resulta que nada hay que aclarar, o si el intento de aclaración se torna en encuesta inquisitorial. Aún más, el propio juez, si estimare la pregunta en orden, puede asumir la iniciativa de la aclaración que interesa el jurado toda vez que no siendo él quien juzga, tiene mayor latitud que el jurado para ejercer esta función sin lastimar la integridad del juicio, con la mesura que su alto oficio reclama, cuidándose de sustituir, en vez de complementar, la labor del fiscal o del defensor. *Pueblo* v. *Pabón*, 102 D.P.R. 436, 440 (1974). En los procesos por delito grave, ordena la Constitución en su Art. II, Sec. 11, el acusado tendrá derecho a que su juicio se ventile ante un jurado imparcial.

El interrogador que no está restringido por la disciplina jurídica del profesional del Derecho ni moderado por la educada abstención del magistrado, caerá en el vicio de perseguir una contestación que coincida con su guardada opinión sobre el objeto de su pregunta y aun sin quererlo tomará una posición de antagonismo o simpatía hacia el testigo o el acusado que ofende la imparcialidad de su encomienda como juez de hechos.

El rol de jurados como examinadores de testigos es cuestión vital que afecta la legalidad intrínseca del proceso criminal y que requiere una supervisión por el tribunal que no puede ser abdicada o transferida a la elección del fiscal y la defensa entre allanarse u objetar este tipo de intervención. Es cerrar los ojos ante las realidades del proceso en que un hombre pasa juicio sobre otro, pretender que el defensor de un reo de asesinato en primer grado asuma en pleno juicio el papel de fiscalizador y supresor de las iniciativas forenses de algún miembro del jurado. Si tiene la rara suerte de no desencadenar la animosidad de los interrogantes, lo menos que le aguarda en la sala de deliberaciones es la callada con-

536

vicción de que algo le oculta el acusado al jurado. [6] Hemos restringido la excesiva participación del juez en los interrogatorios. *Pueblo* v. *Aletriz*, 85 D.P.R. 646, 652, 663 (1962); *Pueblo* v. *Martínez Acevedo*, 88 D.P.R. 199, 201 (1963); *Pueblo* v. *Nieves Alvelo*, 89 D.P.R. 47, 49 (1963). Con mayor razón, habida cuenta de su menor facultad de abstención, deben desalentarse los interrogatorios por el jurado.

El jurado puede moldear la calidad de la justicia criminal que se imparte en el país. Su libertad para pasar juicio es tan dilatada que en determinados casos de veredictos atados a un concepto moral prevaleciente en la comunidad, se reconoce su capacidad para llegar a una solución justa superando impedimentos técnico-legales. [7] Un cuerpo con tan altas atribuciones debe preservar escrupulosamente su objetividad, manteniéndose en el plano de juzgador no comprometido ni identificado con lado alguno de la controversia judicial.

■ La anómala intervención de los jurados en el juicio desnaturalizó el proceso judicial en perjuicio de la imparcialidad a que tenía derecho el acusado. Tratándose de un juicio por asesinato, en que un solo testigo sostiene tanto dicha acusación como la coetánea por portación de un revólver cargado (Infr. Art. 8, Ley de Armas), resultando del veredicto absolutorio en ésta que el jurado desechó la parte de su testimonio referente a portación de arma, mas no así la imputación de asesinato; y que el juez tampoco creyó dicha declaración por-

---

[6] Las partes, por imperativos de la condición humana, y ante el temor de hostilizar al que tiene poder de absolver o condenar generalmente se abstienen de protestar la usurpación de sus funciones y de objetar preguntas o evidencia claramente inadmisibles. Wigmore, *Evidence* (1970), Tomo III, sec. 784a, págs. 199–200; Wharton, *Criminal Evidence*, Tomo 2, sec. 406, págs. 279, 280, Ed. 13ª. Ningún abogado defensor sueña con ganarle un punto de derecho a un jurado.

[7] La voluntad del Estado como tal impuesta a una comunidad renuente; la voluntad de la mayoría impuesta a una minoría vigorosa y resuelta; la voluntad de una minoría militante impuesta a una mayoría serena, encuentran hoy en el jurado el mismo obstáculo que antes confrontaron reyes y ministros. Pound, *Jurisprudence*, Tomo III, pág. 365.

que absolvió al apelante en el caso de posesión ilegal de un arma de fuego (Art. 6, Ley de Armas), la convicción que descansa estrictamente en la estimación de la prueba por el jurado, específicamente en la adjudicación de credibilidad entre teorías irreconciliables, representadas por la versión de un solo testigo presencial, el dictamen del patólogo y la coartada del acusado, tiene una base tan precaria que no puede sobrevivir la cuestionada desviación del debido proceso de ley. "Todo procedimiento que ofrezca una posible tentación al hombre promedio como juez . . . de negarse a sostener la balanza fiel, clara y cierta entre el Estado y el acusado le niega a éste el debido proceso de ley." *Tumey* v. *Ohio*, 273 U.S. 510, 532, ratificado en *In Re Murchison*, 349 U.S. 133, 136 (1955).

Afectada en su raíz la integridad del proceso, el veredicto producido está viciado. Habrá un nuevo juicio. *Revocada.*

El Juez Asociado Señor Rigau no intervino.